# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MICHAEL FERGUSON,                                          No. 9:19-CV-927
                                                                              (GLS/ATB)
                                            Plaintiff,

     v.

CORRECTION SERGEANT BRYAN D. MASON, et al.,

                                            Defendants.

---

MARK D. GREENBERG, ESQ., for Plaintiff
CHRISTOPHER LIBERATI-CONANT and MELISSA A. LATINO
  Asst. Attorneys General, for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT AND RECOMMENDATION

     Michael Ferguson filed this action, under 42 U.S.C. § 1983, claiming that, his civil rights were infringed while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton"). Plaintiff alleges that, while responding to an assault on him by another inmate on August 26, 2016, defendants Sgt. Bryan Mason and Correction Officers ("CO") Kevin Dominie and John Lamora subjected plaintiff to excessive force, in violation of the Eighth Amendment. (Compl., Dkt. No. 1). Plaintiff also asserted a state-law negligence claim based on the same allegations.

     On January 15, 2020, defendants moved for summary judgment based, in part, on

plaintiff's alleged failure to exhaust his administrative remedies.  (Dkt. Nos. 15, 16).[1]

Plaintiff opposed the defense motion and cross-moved for summary judgment on the

affirmative defense of failure to exhaust.  (Dkt. No. 17).[2]  On August 25, 2020, Senior

U.S. District Judge Gary L. Sharpe referred the matter to me "to conduct an Exhaustion

Hearing, and for the issuance of a Report and Recommendation as to whether plaintiff

Michael Ferguson exhausted his administrative remedies before commencing the

pending action."  (Dkt. No. 22).

Five defense witnesses and the plaintiff testified during a remote video exhaustion

hearing on November 5, 2020, the transcript of which appears at Dkt. No. 35.[3]  The

parties stipulated to the admission of eight plaintiff's exhibits (P-1 through P-8) and

eight defense exhibits (D-1 through D-8).  I advised the parties that I might rely on the

declarations and exhibits that had been submitted in connection with the summary

judgment motions, including the declarations of defense witness Rachel Sequin (Dkt.

No. 15-2) and plaintiff (Ex. D-9), which were used during examinations of those

witnesses at the exhaustion hearing.  (*See* Tr. at 42-43, 191, 193-94, 198, 202-03).  The

parties submitted post-hearing letter briefs to supplement the arguments presented in

connection with the summary judgment motions.  (Dkt. Nos. 36, 37).

---

[1] Defendants also moved to dismiss plaintiff's state law claims on grounds other than failure to exhaust.  (Dkt. No. 15-11).  Plaintiff did not respond to that aspect of the defense motion.  Defendants previously filed, but then withdrew, a prior motion for summary judgment. (Dkt. Nos. 8, 13, 14).

[2] Defendants (Dkt. No. 18) and plaintiff  (Dkt. No. 21) filed further submissions with respect to these motions.

[3] Subsequent references to the transcript of the hearing will be cited as "Tr."

Based upon the evidence presented at that hearing and the pre- and post-hearing submissions, I find that the defendants have sustained their burden of proving, by a preponderance of the evidence, that the grievance process was available to plaintiff and that he failed to exhaust his administrative remedies.  The court concludes that plaintiff's version of events is exaggerated and contradicted by other persuasive evidence, and his claims that he was unable to file a timely grievance due to his physical disabilities and because numerous DOCCS staff refused his requests for assistance are not credible.  Further, despite instructions from DOCCS central office on how he could follow up when his initial grievance submission was rejected as untimely, plaintiff did not complete the prescribed administrative process, as required.  Accordingly, this court recommends that plaintiff's civil rights complaint be dismissed for failure to exhaust, and that his state negligence claims be dismissed on the grounds raised by the defendants, as to which plaintiff failed to respond.

I.    **Exhaustion of Administrative Remedies**

   A.    **General Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not

3

available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York generally consists of a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R."), tit. 7 §§ 701.5(a)(1) and (b).[4] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the

---

[4] These regulations are also set forth in DOCCS Directive # 4040, relating to the Inmate Grievance Program. (*See* Ex. D-6; Tr. at 10, 13, 46-47).

Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also an expedited procedure for complaints raising bona fide issues of harassment or other misconduct by DOCCS staff, which bypasses the IGRC, and initially refers the grievance to the facility superintendent or his designee for prompt review, investigation, and decision. *Id.* § 701.8. (*See* Tr. at 10, 48-49 (two-step grievance process applies to staff "misconduct" cases)).

Per DOCCS regulations and DOCCS Directive # 4040, inmates typically have 21 days from the alleged incident to file a grievance. 7 N.Y.C.R.R. § 701.5(a). The regulations also provide that an IGP Supervisor may grant an exception to the 21-day time limit based upon mitigating circumstances, as long as the request is made within 45 days after the alleged incident. *See* 7 N.Y.C.R.R. § 701.6 (g)(1)(i)(a). *See also Adams v. O'Hara,* No. 16-CV-527, 2019 WL 652409, at *2 (N.D.N.Y. Feb. 15, 2019) (GTS/ATB) ("[I]f an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's [IGP] Supervisor for an exception to the time limit based on mitigating circumstances."). "An inmate may pursue a complaint that an exception to the time limit was denied by filing a separate grievance." 7 N.Y.C.R.R. § 701.6 (g)(1)(ii)

The Second Circuit previously utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether

the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Id.* (quoting *Ross*, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which

each of the above would apply. *Ross*, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B.    Exhaustion Hearings

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial relating to his exhaustion of administrative remedies. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Rather, PLRA exhaustion is a matter of judicial administration, and the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust. *Id*. at 308-08.

As noted above, the defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *See, e.g., Howard v. Goord*, No. 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (Suddaby, J.). "As a result, practically speaking, while

7

the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Id*. While there is some ambiguity in the district court cases in the Second Circuit on this point, I agree with Magistrate Judge Peebles' cogent analysis that, while "the burden of production" may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof, by a preponderance of the evidence, with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g.*, *Grant v. Kopp*, No. 9:17-CV-1224 (GLS/DEP), 2019 WL 368378, at *4, 8 (N.D.N.Y. Jan. 3, 2019), report and recommendation *adopted*, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019).

## II.    Facts

### A.    Undisputed Facts

During the altercation on August 26, 2016 at Clinton, plaintiff struck his head and suffered a spinal cord injury, resulting in the immediate loss of upper and lower extremity function. (Ex. P-2, Bates No. 085; Tr. at 139-40). Later that day, plaintiff was admitted to the Albany Medical Center and, on August 27th, he underwent spinal surgery–"an uncomplicated anterior cervical diskectomy and interbody fusion." (Ex. P-2, Bates Nos. 085, 087). Plaintiff remained at the Albany Medical Center, under the continual one-on-one supervision of correctional officers from the Greene Correctional Facility ("Greene"), until September 22, 2016. (Tr. at 88-93, 191-93). On that date, plaintiff was transferred to the Regional Medical Unit ("RMU") at the Coxsackie Correctional Facility ("Coxsackie"). (Tr. at 191-92).

On October 31, 2016, while still confined at the Coxsackie RMU, plaintiff submitted a four-page "grievance" alleging that, on August 27, 2016,[5] he was assaulted by correction officers at Clinton who responded to his altercation with another inmate. (Ex. D-2). In that document, plaintiff stated that he was "crip[pled]/paralyze[d], just recover[ed] a little bit in my right hand to find the strength to write." (*Id*.). The IGP Supervisor returned his complaint to plaintiff, explaining:

> Pursuant to Directive #4040, 701.5, (a), (1), a complaint must be submitted to the clerk within 21 days of the alleged occurrence. You have not presented mitigating circumstances that would warrant accepting this complaint as a grievance beyond the timeframes set forth in Directive #4040. In addition it is noted that pursuant to Directive #4040, 701.6(g), (1), (i), (a), An exception to the (21 day) timeframe may not be granted more than 45 days after an alleged occurrence.

(Ex. D-3).[6] Plaintiff sent his grievance and the IGP Supervisor's response to the DOCCS central office in Albany. He was advised to file a further grievance, which plaintiff decided not to do, concluding that another grievance would be "irrelevant" given that he had already received a negative response to his initial grievance. (Tr. at 200-02; Ex. D-9 ¶ 10, Dkt. No. 17-2).[7]

---

[5] Despite some confusion about the date of the incident during which plaintiff was injured, it is clear that it occurred on August 26, 2016. (Tr. at 20; Ex. P-2, Bates No. 085).

[6] The parties agree that the 21-day deadline relating to the August 26, 2016 incident would have been September 17, 2016, and the 45-day deadline would have been October 10, 2016. (Tr. at 21).

[7] Plaintiff acknowledged this communication with the central office in a prior declaration and during his hearing testimony, but neither side was able to locate or produce any related documentation. (Tr. at 202-03).

**B.    The Defense Version of Disputed Facts**

Defense witnesses, including Rachel Sequin, the current DOCCS Assistant Director for the Inmate Grievance Program and Jeffrey Hale, the current IGP Supervisor at Coxsackie and a former DOCCS Assistant Director for the IGP, testified about the availability of the inmate grievance program, both to DOCCS inmates being treated at the Albany Medical Center, and to those confined at the Coxsackie RMU.  (Tr. at 7-19, 44-58, 92-93, 164-65).  Ms. Sequin and Mr. Hale confirmed the basic steps and deadlines for the grievance process, as outlined above in the summary of applicable law, and explained the various ways in which DOCCS inmates were informed about, and assisted with, that process.  (Tr. at 9-15, 47-58).

As discussed below, plaintiff and his counsel did not question the general availability of the grievance process at these facilities and acknowledged plaintiff's familiarity with the rules relating to that process.  (Tr. at 182-83, 189, 200).  However, plaintiff contended that the program was "unavailable" to him in his particular circumstances.  Plaintiff alleged that, given his slowly-improving paralysis due to his spinal injury, he was unable to personally write out a grievance during the 45-day period following the August 26, 2016 incident, and that his repeated requests for assistance from DOCCS personnel in writing out his grievance were rebuffed or ignored.

Assistant Director Sequin acknowledged that DOCCS had no specific written protocol about how to assist an inmate housed in an outside hospital who was unable to write a grievance, and that DOCCS security staff was not specifically trained with respect to that unusual scenario.  (Tr. at 22-24, 28-29).  However, Ms. Sequin pointed to

10

a provision in DOCCS Directive 4040 and the applicable DOCCS regulations which stated: "Reasonable Accommodations. The IGP supervisor will ensure that disabled inmates are provided the necessary assistance to facilitate their access to and use of the IGP." (Tr. at 27; Ex. D-6 § 701.3(g)). Ms. Sequin and Mr. Hale testified that the IGP Supervisor at Coxsackie made at least weekly rounds in the RMU and was trained to help inmates who required assistance with respect to the grievance process. (Tr. at 33, 37, 65-67, 69-70; D-6 § 701.6(a) ("An inmate may present or appeal a grievance unaided, or may be advised or assisted by a staff member or another inmate of his or her choosing . . . .")). While the correction officers who testified were not clear as to whether they could help a disabled inmate by physically writing out his grievance, they stated that security staff was trained to refer such an unusual situation, which they never recalled encountering, to an IGP Supervisor or supervising officer. (Tr. at 94-95, 102-04, 168-69, 170, 177, 178-79).[8]

Assistant Director Sequin testified that, although staff at DOCCS facilities would not have the discretion to accept a grievance that was filed more than 45 days after the related incident or staff conduct, DOCCS Directive 4040 explicitly allowed a separate grievance of a decision, at the facility level, not to accept an untimely grievance. (Tr. at 11, 34-35). Both she and former Assistant Director David Hale stated that the CORC could allow and, on occasion had allowed, a grievance first filed after the 45-day

---

[8] Ms. Sequin and Mr. Hale also testified that security staff was trained to refer unusual situations regarding the grievance process to the IGP or to superior officers, to help ensure that inmates received necessary assistance with respect to that process. (Tr. at 24, 29, 56-57, 69-71, 76-78).

deadline to proceed if the inmate set forth sufficient mitigating circumstances in a follow-up grievance. (Tr. at 34-35, 50-52). Ms. Sequin testified that the CORC had no record of any appeal of a separate grievance filed by plaintiff regarding the decision of the IGP Supervisor at Coxsackie that his initial grievance was untimely. (Tr. at 36).

## C.     Plaintiff's Version of Disputed Facts

Plaintiff testified that, as a result of a broken neck sustained during the August 26, 2016 incident, which he alleged was the result of excessive force used against him by the defendant officers, he "could not move from the neck down." (Tr. at 181, 188). Following his spinal cord surgery and some physical therapy at Albany Medical Center, plaintiff experienced weakness in his hands and numbness, and he was able to move only his right toe and his left hand. (Tr. at 183-84).[9]   Plaintiff was familiar with the grievance process, had filed grievances previously, and knew that he had to file a grievance about the August 26th incident within 21 days. (Tr. at 182-83, 185, 189). But, he was not physically able to write out a grievance and, when he requested assistance in writing his grievance from various officers guarding him, he was told that they could not do that. (Tr. at 183-85, 193).[10]

When plaintiff was moved to the Coxsackie RMU, his right hand was still numb, and he could not hold a pen. (Tr. at 188). Even after some occupational therapy, plaintiff's hand became numb and started to hurt when he tried to start writing a

---

[9] Plaintiff testified that he was right-handed. (Tr. at 186, 187).

[10] Plaintiff stated that he also asked his nursing assistant for help writing his grievance, to no avail. (Tr. at 183-84). He was in a single room at the Albany Medical Center, so there was no one else he could ask for assistance with his grievance. (Tr. at 186).

paragraph of a grievance.  (Tr. at 188, 194-95).  A no-contact order was put in place, so he was not able to seek assistance in writing a grievance from any other inmate.  (Tr. at 186-87).  Plaintiff asked "everyone [he] could for help filing a grievance"– the nurses, the correction officers, and the shift sergeants, including Sgt. Charles Bailey, who testified at the exhaustion hearing.  (Tr. at 189-90, 198).  None of the individuals who plaintiff asked for assistance were able or willing to help him write his grievance.  (Tr. at 189-90).

Plaintiff alleges that he did not have adequate functioning in his right hand to be able to write a grievance until October 31, 2016, following further occupational therapy. (Tr. at 187, 199; Ex. D-2).  When that grievance was rejected by the IGP Supervisor at Coxsackie as untimely, plaintiff transmitted his grievance and the response to the DOCCS central office in Albany, but did not follow their advice to file a separate grievance because he had already received a negative response to his initial grievance. (Tr. at 201-202).

## III.    **Findings and Conclusions**

### A.    **Failure to Exhaust Administrative Remedies**

The court heard plaintiff's testimony during the hearing, and has reviewed the corroborating and contrary evidence submitted.  The court finds that the plaintiff exaggerated his version of events in a number of ways and was contradicted in several instances by other persuasive evidence, which casts considerable doubt on the credibility of plaintiff's testimony.

Plaintiff testified that he asked "everyone [he] could," both at Albany Medical

Center and the Coxsackie RMU for assistance in writing out his grievance.  (Tr. at 193, 198).  Three defense witnesses who had contact with plaintiff between August and October 2016 testified that they had no recollection of plaintiff, or any other inmate, asking for their assistance in physically writing out a grievance.  CO Wesley Holley guarded plaintiff at the Albany Medical Center during various shifts between August 31 and September 7, 2016.  (Tr. at 90-91; Ex. D-7, Bates Nos. 20-21, 23-24, 30).  While CO Holley had no specific recollection of plaintiff from 2016, he was certain that no inmate had ever asked him to write out a grievance.  He would have viewed such a request as very unusual, and would have referred such an issue to his supervisor.  (Tr. at 93-95, 102-04).  Michael Gallagher was a contract registered nurse at the Coxsackie RMU who recalled having some contact with plaintiff in the Fall of 2016, but had no recollection of plaintiff asking for help filing a grievance.  (Tr. at 110, 128, 148, 160-62).

Charles Bailey was a supervising Sergeant at Coxsackie in September and October 2016 who, when on duty, made daily rounds in the RMU.  Sgt. Bailey recalled frequent, if brief, contacts with the plaintiff, who was comfortable asking the Sergeant to address any issues the plaintiff had.  (Tr. at 165-69, 170-71, 176-77; Ex. D-8).  Plaintiff specifically testified that he asked Sgt. Bailey for assistance in writing out a grievance and was told that he could not help plaintiff.  (Tr. at 190, 198-99).  Sgt. Bailey emphatically testified he had no recollection of plaintiff stating that he was physically incapable of writing out a grievance, that he needed assistance with that, or that the RMU staff was preventing plaintiff from filing a grievance.  (Tr. at 169-70, 177, 178-

14

79).[11]  The court found Sgt. Bailey's testimony particularly credible.

Perhaps the strongest evidence undermining plaintiff's claim that he frequently asked for staff assistance in writing out his grievance, is the fact that he made no mention of that when he finally submitted a grievance on October 31, 2016.  In that four-page document, plaintiff explains at length the reasons for the delay in preparing the grievance, but fails to state that he was repeatedly denied help in writing out his grievance, either at the Albany Medical Center or at the Coxsackie RMU.  (Ex. D-2).

The documentary medical evidence, while not conclusive, casts further doubt on plaintiff's credibility and his claim that his injuries precluded him from writing a grievance prior to October 31, 2016.  Plaintiff testified that, even after his surgery and some physical therapy at Albany Medical Center, he could not do anything due to numbness, including in his hands, and "the only thing that was moving at the time was my right toe and my left hand."  (Tr. at 183-84).  Plaintiff claimed that he could not hold a pen in his right hand or write more than his name due to numbness in his dominant right hand from the time he first arrived at the Coxsackie RMU through October 31st. (Tr. at 187, 188; Ex. D-9).

Plaintiff clearly suffered a debilitating incomplete spinal cord injury that initially resulted in the loss of use of his upper and lower extremities.  (Ex. P-2, Bates No. 085; Tr. at 138).  Following his surgery, plaintiff's motor function improved, but his

---

[11] Plaintiff's counsel argued that the defense did not elicit sufficient witness testimony to rebut plaintiff's claims that he frequently asked for staff assistance in writing out a grievance. (Dkt. No. 37 at 2-4).  However, four years after the relevant time period, the defense could not be expected to call every person who had contact with plaintiff between August 26 and October 31, 2016 in an effort to prove that plaintiff had not requested such assistance from anyone.

sensation remained diminished. (Ex. P-2, Bates Nos. 086, 087). Plaintiff participated in physical and occupational therapy at Albany Medical Center but, upon discharge, he still needed further therapy "in order to strengthen his upper and lower extremities." (Ex. P-2, Bates Nos. 087, 090). However, when he was discharged from the hospital, plaintiff's right upper extremity strength was 5/5, significantly higher that the strength in his other extremities. (Ex. P-2, Bates No. 086).

Upon plaintiff's admission to the Coxsackie RMU, RN Lynch noted that plaintiff had neuropathy in his legs and feet and weakness in his left upper and lower extremities, but not in his right extremities. (Ex. D-4, Bates Nos. 0645, 065). The medical staff noted that, during his first few days at the RMU in September 2016, plaintiff had progressed to eating independently. They observed a loss of strength in plaintiff's left arm and leg, but 5/5 strength in his right upper and lower extremities. (Ex. D-4, Bates Nos. 092-095). Plaintiff continued to demonstrate full muscle strength in his upper right extremity on September 25th, October 2nd, and October 9th. (Ex. D-4, Bates Nos. 2616, 2618, 2620).[12] RMU medical records indicate that plaintiff complained of numbness in his right hand and leg, but these symptoms were first reported on October 15th– after the 45-day deadline for requesting leave to file a late grievance–and continued through

---

[12] The entries for the Assessment/Activity chart for plaintiff on September 22, 2016 suggested that plaintiff had diminished muscle strength in his right upper extremity, but Nurse Gallagher testified that the numbers in that grid appeared to be erroneously shifted upward and were meant to report full muscle strength. (Tr. at 121-26). In any event, other medical records from September 23rd reflect that plaintiff had full strength in his upper right extremity. (Ex. D-4, Bates Nos. 094, 095). Plaintiff's counsel emphasized a medical progress note on September 23rd that plaintiff had a weak left hand grasp and a "mild" right hand grasp. (Tr. at 129-132; Ex. D-4, Bates No. 643). Nurse Gallagher testified that the "mild" terminology was not very descriptive, but that it suggested a relatively benign observation about plaintiff's ability to grasp with his dominant right hand. (Tr. at 131-32).

December 22, 2016.  (See Exs. P-3 through P-7).[13]  It is puzzling to the court that, during the period when plaintiff complained of numbness in his right hand, he managed to write out and submit his four-page grievance, dated October 31st, but plaintiff claimed to be incapable of writing a grievance during the prior period when he was not reporting such symptoms.

Plaintiff's counsel elicited testimony from Nurse Gallagher suggesting that plaintiff's full muscle strength in his right arm and hand did not necessarily contradict plaintiff's claim of neurological issues with his dominant right hand or his professed inability to write.  (Tr. at 134-36, 139-41, 143, 146, 156-58).  However, the medical records, taken as a whole, persuade the court that, during at least part of the time period when plaintiff could have timely filed a grievance or requested leave to pursue a late grievance, he was substantially exaggerating the extent to which his injuries interfered with his ability to write with his dominant right hand.

Plaintiff acknowledged that he signed two documents on September 22, 2016, upon his admission to the RMU, but claimed that a nurse had to hold his hand to help him make his signature.  (Tr. at 186, 196-97; Ex, D-4, Bates No. 2482, 2484).  Defense counsel had plaintiff confirm his signature on his January 23, 2020 declaration, submitted in opposition to the defense summary judgment motion, which plaintiff

---

[13] Plaintiff's counsel suggested that a September 22, 2016 Pain Assessment Form completed by Nurse Lynch, which did not reflect any complaints of numbness in plaintiff's right extremities, was incomplete and not credible.  (Tr. at 147-49).  However, Nurse Lynch also completed a detailed Admissions Assessment for plaintiff on September 22nd, which documented a thorough assessment of plaintiff indicating the absence of neuropathy or weakness in plaintiff's right-side extremities.  (Ex. D-4, Bates Nos. 060-067).

acknowledged he signed without any assistance. (Tr. at 198). The court's comparison of plaintiff's signatures on the two documents in September 2016 to the very similar signature on his January 2020 declaration do not support the plaintiff's claim that a nurse was needed to provide plaintiff with physical assistance in signing his name on the earlier documents. If plaintiff had needed or accepted such help in signing his name in September 2016, the 2016 and 2020 signatures would likely have been markedly different.[14]

In the January 23, 2020 declaration plaintiff stated that, at least until October 31st, he was under non-contact orders and was not allowed to get help from any other inmate at the RMU. (Ex. D-9 ¶¶ 3, 6, Dkt. No. 17-2). Presumably because the medical records introduced at trial indicated that plaintiff was on non-contact status at the RMU only from September 22, 2016 through September 27th, he testified during the hearing that he was only on non-contract status for only a week or two. (Ex. D-4, Bates No. 647; Tr. at 193-95).

Based on the court's evaluation of the credibility of plaintiff and the defense witnesses, the court concludes that the defendants have sustained their burden to establish that the grievance process was available to plaintiff during at least part of the

---

[14] A lay fact finder is permitted to evaluate the similarities of handwriting on documents. *See, e.g., United States v. Samet*, 466 F.3d 251, 255 (2d Cir. 2006) (recognizing that a trier of fact may be capable of comparing handwriting on different documents without the help of opinion testimony on that issue)*; Ladner v. City of New York*, 20 F. Supp. 2d 509, 516-17 (E.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999) (court, in the context of a dispositive motion, compares the handwriting on various ballots and concludes that they are not at all similar). The court would note that the extent of my reliance on this particular issue in my overall evaluation of plaintiff's credibility was minimal.

21-day time period after the August 26, 2016 incident, which expired on September 17th. I conclude that the plaintiff exaggerated the extent to which his injuries limited his ability to write, and I am not persuaded that he requested assistance in writing his grievance, as he claimed.  While the security staff at the hospital might not have known exactly how to address a request from an inmate for help in writing a grievance, I credit the testimony of the defense witnesses that such a request would have been referred to someone, such as an IGP Supervisor, who would have arranged for the necessary assistance.[15]

Even if plaintiff's access to the grievance process had been more limited while he was being treated at the Albany Medical Center, he had the ability to request leave to file a late grievance once he was transferred to the Coxsackie RMU, on September 22, 2016, through the end of the 45-day deadline to do so–October 10th.  Plaintiff's physical condition further improved during this time period, and the medical evidence indicates that he was not experiencing weakness or numbness in his dominant hand during this time.  As the defense witnesses testified, the IGP Supervisor at Coxsackie and the supervising sergeants made periodic rounds in the RMU and could have addressed any issues plaintiff might have raised with respect to the grievance process.

Even though plaintiff first filed his grievance after the 45-day deadline for seeking leave to file a late grievance had passed, the IGP Supervisor still considered whether plaintiff had set forth mitigating circumstances that might have excused the

---

[15] CO Holley testified that the DOCCS staff at the Albany Medical Center came from the Greene Correctional Facility (Tr. at 88), so a patient/inmate request concerning grievances could have been communicated to the IGP staff at Greene.

delay in submitting the grievance.  As noted, the plaintiff did not claim, in his grievance, that he requested assistance in writing his grievance and was refused help.  "Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies." *Adams v. O'Hara*, No. 9:16-CV-527 (GTS/ATB), 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019) (collecting cases, including *Cole v. Miraflor*, 02-CV-9981, 2006 WL 457817, at *5 (S.D.N.Y. Feb. 23, 2006) ("Contrary to Cole's claim that administrative remedies were no longer available to him because DOC[C]S did not find mitigating circumstances to excuse his late grievance, . . . the very fact that DOC[C]S' policies provide for the filing of late grievances where there are mitigating circumstances, demonstrates that administrative remedies were available to Plaintiff."), *aff'd*, 305 F. App'x 781 (2d Cir. 2009)).  Based on this court's evaluation of the credibility of plaintiff's claims that he was not capable of writing a grievance before October 31, 2016 and that his requests for assistance from DOCCS staff were denied, I conclude that plaintiff failed to exhaust available administrative remedies because he failed to file a timely grievance or a timely request to file a belated grievance supported by an adequate showing of mitigating circumstances.

The IGP Supervisor's decision may have suggested that plaintiff had no further recourse with respect to his grievance, given the passing of the 45-day deadline. However, plaintiff acknowledged that someone from the Albany central office advised him of the remedy he could still pursue–a separate grievance.  That advice was consistent with the provisions of § 701.6(g)(1)(ii) of DOCCS Directive 4040, which

authorized a separate grievance when an IGP Supervisor denied a request for leave to file a late grievance. The testimony of both the current and former Assistant Directors for the IGP made clear that a follow-up grievance, if pursued through all of the steps of the process, could have resulted in plaintiff being allowed to pursue his initial grievance, even though it was filed after the 45-day deadline, if he could persuade the CORC that there were sufficient mitigating circumstances. Plaintiff chose not to pursue that option, based on his conclusion that it would be "irrelevant," notwithstanding the fact that his initial grievance failed to raise arguably mitigating circumstances that plaintiff now asserts–*i.e.*, that DOCCS staff denied his repeated requests for assistance in writing a grievance. Plaintiff's choice not to pursue the grievance process through all the prescribed steps independently supports a finding that he failed to exhaust available administrative remedies. *See, e.g.*, *Lopez v. Goodman*, No. 10-CV-6413, 2013 WL 3105550, at *3 (W.D.N.Y. June 18, 2013) ("The grievance procedure is not unavailable to an inmate simply because he missed an initial deadline for filing a grievance. If an inmate misses the deadline for filing, the IGP contains provisions for requesting an extension of time to file in cases of mitigating circumstances. 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a). Moreover, a denial of an extension of time to file a grievance is itself a grievable complaint that may be pursued via the IGP. 7 N.Y.C.R.R. § 701.6(g)(1)(ii)."); *Tomony v. Cty. of Suffolk*, No. 10-CV-5726, 2013 WL 55821, at *4 (E.D.N.Y. Jan. 3, 2013) (plaintiff's failure to exhaust his administrative remedies by not availing himself of the steps established by § 701.6(g) with respect to untimely grievances "cannot be excused based upon plaintiff's mere speculation that his

grievance would have been denied"); *Warren v. Bealey*, No. 9:12-CV-1318 (TJM/RFT), 2014 WL 4715863, at *11 & n.10 (N.D.N.Y. Sept. 22, 2014) (when defendant was given explicit instructions on how to follow up, pursuant to § 701.6(g), when his untimely grievance was rejected, and he failed to follow those instructions, he cannot be considered to have exhausted his administrative remedies).

In opposing the defense summary judgment motion, plaintiff's counsel argued that the prescribed process for pursuing a separate grievance when plaintiff's initial grievance was rejected as untimely, was "unavailable" to plaintiff based on *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016). In *Williams*, the Second Circuit considered whether administrative remedies had been "actually available" to the plaintiff under *Ross v. Blake*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id*. at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id*. at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id*.

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id*. at 124. The defendants relied on a DOCCS regulation providing that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id*. (quoting N.Y.C.R.R. § 701.6(g)(2)).

22

> [D]efendants [outline] three options that would be presented to an inmate
> following his appeal of an unfiled grievance: (1) if it is still within 21 days of the
> incident, the inmate can re-file the complaint; (2) if it is beyond 21 days but
> within 45 days of the incident, the inmate can request an exception to the 21-day
> time limit if he can show mitigating circumstances; or (3) if it is more than 45
> days since the incident, the inmate may file a separate complaint grieving the
> denial of an extension to the time limit.

*Id*. at 125.  The *Williams* court rejected the defense arguments stating: "These options
are pieced together from various provisions in the regulations that do not involve
appeals of grievances but provide instructions on the timelines that apply to the filing of
new complaints. See N.Y.C.R.R. tit. 7, § 701.5(a)(1); id. § 701.6(g)(1)(i)(a); id. §
701.6(g)(1)(ii)."  Thus, *Williams* holds that "the process to appeal an unfiled and
unanswered grievance is prohibitively opaque, such that no inmate could actually make
use of it." *Id*. at 126.

The holding of the *Williams* case does not apply to plaintiff Ferguson's particular
circumstances.  In this case, DOCCS seeks to apply the procedures of § 701.6(g)(1) in
the very situation in which they explicitly apply–explaining how an inmate may follow
up when he is advised that a grievance has been reviewed at the facility level, but has
been rejected as untimely.  Moreover, plaintiff Ferguson concedes that he was advised
by the DOCCS central office that he could pursue a separate grievance after his initial
grievance was rejected as untimely, which advice was consistent with § 701.6(g)(1)(ii),
as set forth in DOCCS Directive 4040–a publication readily available to DOCCS
inmates.  The court in *Williams* found that the administrative remedies were
"unavailable" because the process was "so prohibitively opaque, such that no inmate
could actually make use of it."  829 F.3d at 126.  However, the plaintiff in this case was

explicitly advised to use the process set forth in § 701.6(g)(1)(ii), but he decided to ignore that advice.   Based on the record developed in this case, the procedures established by § 701.6(g)(1)(ii) were not futile or otherwise "unavailable" to plaintiff Ferguson.[16]

### B.    Plaintiff's State Law Negligence Claim

Defense counsel correctly argues that "New York Correction Law § 24 bars federal suit on state-law claims against officers in their individual or personal capacities." *Gill v. Tuttle*, 93 F. App'x 301, 302 (2d Cir. 2004); *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365-66 (S.D.N.Y. 2013) ( N.Y. Correct. Law § 24 "is not a bar to claims against corrections officers and employees under § 1983.  *See Haywood v. Drown*, 556 U.S. 729, 740-41 . . . (2009).  However, it does provide immunity for claims under state laws.  'Such immunity is available whether the action is

---

[16] The Second Circuit in *Williams* stated that even though § 701.6(g)(1)(ii) "suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident." 829 F.3d at 125-26.  However, there was evidence before this court from the exhaustion hearing that was not before the court in *Williams*, which reversed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) based on exhaustion.  In this case, the IGP Supervisor who rejected plaintiff's grievance as untimely based on the 45-day deadline still considered whether plaintiff offered sufficient mitigating circumstances to justify the delay in filing.  The present and a former DOCCS Assistant Director for IGP both testified that CORC, on an appeal from a separate grievance of an IGP Supervisor's rejection of an initial grievance first filed past the 45-day deadline, had the discretion to allow an inmate to proceed with the initial grievance upon a showing of mitigating circumstances, and had, in fact, done so in some prior cases.  Moreover, there is strong evidence that plaintiff was specifically advised that he could pursue such a separate grievance and chose to ignore that advice.  In any event, based on this court's credibility determinations with respect to plaintiff's claims that he was unable to write a grievance prior to October 31, 2016 and that he made requests for assistance from DOCCS staff that were refused, a preponderance of evidence establishes his failure to exhaust available administrative remedies independently of his refusal to pursue a separate grievance of the rejection of his initial grievance as untimely.

24

pursued in a state court or, under pendent jurisdiction, in a federal court.'. . .")

To the extent plaintiff intended to pursue his state-law negligence claims for damages against the defendants in their official capacity, such claims would be barred by sovereign immunity under the Eleventh Amendment. *See, e.g., Gunn v. Bentivegna*, No. 1:20-CV-2440, 2020 WL 2571015, at \*2–3 (S.D.N.Y. May 19, 2020) (plaintiff's civil rights claims against DOCCS, as well as his claims for damages against the individual defendants in their official capacities, are barred under the doctrine of Eleventh Amendment immunity); *Chris H. v. New York*, 764 F. App'x 53, 55 (2d Cir. 2019). Accordingly, this court recommends that plaintiff's state-law negligence claims against the named individual defendants be dismissed, without prejudice to their being filed against an appropriate party in the appropriate state court.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the plaintiff's claims under 42 U.S.C. § 1983 be **DISMISSED**, based on his failure to exhaust available administrative remedies, and it is further

**RECOMMENDED** the plaintiff's state-law negligence claims be **DISMISSED WITHOUT PREJUDICE**, but without leave to amend in this action.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary*

*of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

FED. R. CIV. P. 6(a), 6(e), 72.


Dated: January 7, 2021

Hon. Andrew T. Baxter
U.S. Magistrate Judge